# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 18, 2013 Session

## REBECCA COLEMAN, DVM v. THE HUMANE SOCIETY OF MEMPHIS AND SHELBY COUNTY, A Tennessee not for profit organization and GINGER MORGAN

**Interlocutory Appeal from the Circuit Court for Shelby County**
**No. CT-000897-08     James F. Russell, Judge**

---

**No. W2012-02687-COA-R9-CV - Filed February 14, 2014**

---

This appeal involves a veterinarian's common law and statutory claims for retaliatory discharge and her claim for negligent infliction of emotional distress. The defendant employer filed a motion for summary judgment on all claims. The trial court granted the employer's motion for summary judgment on the negligent infliction of emotional distress claim because the veterinarian had not introduced expert proof to support her claim. The trial court denied the motion for summary judgment on the retaliatory discharge claims. Both parties filed applications for interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, which were granted by the trial court and by this Court. We reverse the trial court's grant of summary judgment on the negligent infliction of emotional distress claim, and we affirm the trial court's denial of summary judgment on the retaliatory discharge claims. This matter is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9; Interlocutory Appeal; Judgment of the Circuit Court Reversed in Part, Affirmed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Mimi Phillips, Memphis, Tennessee, for the appellant, Rebecca Coleman, DVM

Jeff Weintraub, Sally F. Barron, Memphis, Tennessee, for the appellees, The Humane Society of Memphis and Shelby County, A Tennessee not for profit organization and GINGER MORGAN

# OPINION

## I. FACTS & PROCEDURAL HISTORY[1]

The Humane Society of Memphis and Shelby County ("Humane Society") is a nonprofit organization, incorporated in 1933, that has operated a shelter for injured and abused animals for many years. The Humane Society does not accept healthy animals. Historically, veterinary care for the Humane Society's animals, including euthanasia, was performed off-site by local veterinarians in their clinics.

On or about January 20, 2007, the Humane Society moved to a new multimillion-dollar facility, with an adequate clinic for providing on-site veterinary care. Ginger Morgan served as the executive director of the Humane Society. During December 2006, shortly before the Humane Society's move to the new facility, Ms. Morgan approached Dr. Rebecca Coleman, a licensed veterinarian, about coming to work for the Humane Society to fill its new position of staff veterinarian. Dr. Coleman had previously served as a volunteer vet at the Humane Society and donated her services to care for animals abandoned during Hurricane Katrina. After several discussions, Dr. Coleman ultimately agreed to become employed by the Humane Society as its permanent, but part-time, staff veterinarian. Dr. Coleman would work on-site at the Humane Society three days per week, at a salary of $450 per day, or $50,000 per year.[2] Dr. Coleman began her employment with the Humane Society on January 1, 2007. In April 2007, Dr. Coleman's pay rate was changed because she had not been working three full days at the Humane Society. From that point forward, she was paid $250 per day.

Dr. Coleman's job duties consisted of examining animals brought to the shelter, treating injured animals, performing surgical operations, and performing or supervising euthanasia on animals with multiple severe illnesses or injuries which rendered recovery impossible or highly unlikely, in accordance with the Humane Society's policies. Dr. Coleman's time was largely spent performing spay/neuter surgeries on animals, in order to ready them for adoption, but her duties also included overseeing all the veterinary care, the clinic operations, and two veterinary assistants. As staff veterinarian it was Dr. Coleman's legal responsibility to ensure that the Humane Society maintained compliance with veterinary

---

[1] During the course of the proceedings below, both parties filed lengthy statements of undisputed facts for purposes of summary judgment. In addition, the Humane Society admitted numerous facts in its answer to the complaint. Therefore, most of the material facts in this case are undisputed.

[2] The parties stipulated that these were the terms of Dr. Coleman's initial employment agreement. By our calculation, $450 per day, times three days per week, times 52 weeks, would equal $70,200 per year (not $50,000). There is no explanation for this discrepancy that we can glean from the record.

standards and procedures.

Sometime after beginning work, Dr. Coleman became concerned about overcrowding of the animals at the Humane Society. According to Dr. Coleman, "nobody had any ideas of the exact numbers" of animals that were housed at the Humane Society. Dr. Coleman began complaining to Ms. Morgan about the overcrowding problem as early as May 2007. That same month, Dr. Coleman conducted an inventory of the animal population which revealed that there were 247 dogs and 146 cats housed at the facility, which had a capacity of approximately 125 dogs and 100 cats. According to Dr. Coleman, cages designed to house one or two animals were housing four or five. The overcrowding caused a sanitation problem. Some dogs, too closely confined, developed a condition known as "kennel crazy" syndrome, characterized by extreme stress and abnormal behaviors. The overcrowding allowed cases of respiratory infection and ringworm to become epidemic. At least two employees contracted ringworm, which is transferrable from animals to humans.

Despite the overcrowding, new animals continued to be accepted throughout the summer of 2007, usually by Ms. Morgan or one of the veterinary assistants, and at one time the animal population reached 400. Tension developed between Ms. Morgan and Dr. Coleman due to the crowding issue. According to Dr. Coleman, Ms. Morgan was unwilling to consider euthanasia for critically ill animals, which caused them needless suffering and exacerbated the crowding problem.[3] Dr. Coleman was asked by the Humane Society's president, Paul Guibao, to address the Humane Society's board of directors on September 10, 2007, about the overcrowding problem and the health and disease issues it was creating. Ms. Morgan did not want Dr. Coleman to speak to the board. Nevertheless, Dr. Coleman addressed the board of directors about the issues despite Ms. Morgan's position.

On September 19, 2007, an incident occurred involving Dr. Coleman and Ms. Morgan, the executive director. Ms. Morgan brought two puppies to the Humane Society, stating that they were hers and she wanted them vaccinated. Dr. Coleman reminded Ms. Morgan that the Humane Society did not have a premises permit and therefore it was illegal for them to treat any animals except those belonging to the Humane Society. According to Mr. Lulloff, the operations manager who witnessed the incident, Ms. Morgan became angry and a "heated discussion" ensued, which involved the use of foul language by Ms. Morgan. Mr. Lulloff reported the incident to the Humane Society president, Mr. Guibao, by phone and

---

[3] By way of example, it was undisputed for purposes of summary judgment that one cat, Jazzy, had a severe upper respiratory infection and sat in a cage for thirty days unable to breathe because Ms. Morgan would not allow it to be euthanized. It was also undisputed that puppies infected with the incurable parvo virus lay in their cages suffering until they died because Ms. Morgan and others would not allow them to be "put out of their misery."

email. Mr. Guibao advocated the firing of Ms. Morgan. Instead, the board of directors placed Ms. Morgan on administrative leave and banned her from the building for two weeks. Mr. Guibao, the president, resigned the next day. His letter of resignation to the board defended Dr. Coleman.

In the weeks that followed, Dr. Coleman discovered and complained about a number of illegal practices which had been occurring at the Humane Society without her knowledge. The incidents of illegality involved one of the veterinary assistants, Lorie Freeza. Drugs classified as Schedule II and Schedule III substances were sold to Dr. Coleman under her federal DEA license, making her strictly accountable for them under both federal and state law. The controlled substances, used to anesthetize or euthanize animals, were kept in a locked cabinet. Under Tennessee law, euthanasia may only be performed by a licensed veterinarian or by certain persons who have successfully completed a euthanasia-technician certification course. *See* Tenn. Code Ann. § 44-17-303(d). Ms. Freeza was not certified as a euthanasia technician. Dr. Coleman had given a key to the locked cabinet to Ms. Freeza, so that when shipments of the drugs arrived on days when Dr. Coleman was not on the premises, Ms. Freeza could place them in the locked cabinet. Ms. Freeza's illegal use of these substances came to light after Ms. Freeza and another employee euthanized eleven cats on September 20, a day when Dr. Coleman was not on the premises, using controlled substances registered to Dr. Coleman under her DEA license.[4] Upon examining the charts for the euthanized cats, Dr. Coleman discovered that they did not contain the legally required recordings of what euthanasia drug was used and the dosage quantity. Upon further investigation, Dr. Coleman also learned that, two weeks earlier, on September 6, Ms. Freeza had brought three of her own ferrets to the Humane Society when Dr. Coleman was not on the premises and euthanized them in the clinic using the controlled substances which were registered to Dr. Coleman. After reviewing additional records, Dr. Coleman came to the conclusion that Ms. Freeza may have euthanized as many as seventy-two animals at the Humane Society over the previous months without Dr. Coleman's knowledge.

Dr. Coleman also learned that Ms. Freeza had been selling prescription drugs belonging to the Humane Society (such as heartworm medication) to employees and others, including herself. State law forbids the dispensing of heartworm medication and other veterinary prescription drugs except by a licensed veterinarian who has established a veterinarian-client-patient relationship concerning the animal for whom the drugs are

---

[4] The cats, all morbidly ill, had been identified by Dr. Coleman and others, on September 19, as needing to be euthanized. Dr. Coleman was to perform the euthanasias on September 21, her next day at work. Ms. Freeza was angry with Dr. Coleman on the day she performed the unauthorized euthanasias because she had been issued three written reprimands by Dr. Coleman and another supervisor the day before, regarding various issues.

intended, meaning that the veterinarian has personally examined the animal and devised a treatment plan. *See* Tenn. Comp. R. & Regs. § 1730-01-.21(2).

Both parties agree that "[t]he sale of drugs, performing euthanasias and illegal use of controlled substances by Lorie Freeza constituted the illegal, unlicensed practice of veterinary medicine." Dr. Coleman and her supervisor, operations manager Butch Lulloff, formally complained to Ms. Morgan about Ms. Freeza's conduct and urged that she be fired. However, Ms. Morgan did not terminate Ms. Freeza.

During a conference call on September 25, 2007, the president of the board of directors told another board member that she wanted to fire Dr. Coleman. The board members who were participating in the conference call decided that Dr. Coleman was not a "good fit" for the Humane Society. In an October 1, 2007 email, one of the board members stated, "The decision to continue our in house vet clinic may end up being financial in addition to our other concerns." The treasurer of the board of directors wrote in another email later that day, "I believe we've already decided Dr. Coleman is gone[.]"

On October 17, Mr. Lulloff, Dr. Coleman's supervisor, sent an email to one of the board members regarding Ms. Frezza's unauthorized use of controlled substances to euthanize her own ferrets. On October 19, there was a meeting attended by Dr. Coleman, operations manager Mr. Lulloff, executive director Ms. Morgan, board member Dr. Bob Egerman, and others. Dr. Coleman complained about Ms. Freeza's unauthorized performance of euthanasia and her dispensing of heartworm medications to employees and their family members. After the meeting, Dr. Coleman sent an email to the board expressing her concern about the possible effect of Ms. Freeza's conduct on Dr. Coleman's veterinary license and DEA license. Nevertheless, Ms. Freeza was not terminated.

At some point during this same month, board member Dr. Egerman asked Dr. Coleman to reduce her hours to about twenty per week for cost containment and budgetary reasons. In November 2007, Ms. Morgan recommended further reducing the weekly veterinarian hours as a way to save money. On November 28, a board member instructed Ms. Morgan to draft the Humane Society's next budget without accounting for any pay for Dr. Coleman. On December 2, one of the board members sent an email to the board and to Ms. Morgan, outlining options for the reduction of operating expenses, one of which provided for the elimination of the in-house veterinary position and the use of outside veterinarians on an as-needed basis. On December 3, the board met and decided that the veterinary position should be cut until there was a need for more veterinary hours (although there is some dispute as to whether an actual vote was taken on this measure).

On December 14, 2007, the Humane Society terminated Dr. Coleman's employment without prior notice, effective immediately. Ms. Morgan informed Dr. Coleman that she was being terminated because of budget constraints as the finance committee had met the previous week and decided to eliminate in-house veterinary services. Dr. Coleman was not given any other reason for her termination. Ms. Morgan required that Dr. Coleman box up her things and leave the building immediately. Dr. Coleman was not given the same severance benefit (two weeks pay) that the Humane Society had given to another separated employee several months earlier.

Dr. Coleman filed this lawsuit against the Humane Society in February 2008.[5] She asserted causes of action for (1) common law retaliatory discharge, (2) the statutory cause of action for retaliatory discharge provided by Tennessee Code Annotated section 50-1-304, and (3) negligent infliction of emotional distress. Dr. Coleman's complaint recounted her concerns and complaints about the overcrowding and resulting epidemic diseases at the Humane Society throughout the summer of 2007. She alleged that these conditions caused many animals to endure intense suffering and even led to euthanization in some cases. Dr. Coleman's complaint also set forth the facts surrounding her complaints about Ms. Freeza's unauthorized performance of euthanasia at the Humane Society, which, Dr. Coleman alleged, violated Tennessee law, including Tennessee Code Annotated section 44-17-303(d) and the regulations governing euthanasia of nonlivestock animals promulgated by the Tennessee Board of Veterinary Medical Examiners. In addition, Dr. Coleman alleged that Ms. Freeza had used Schedule II drugs during the procedures without Dr. Coleman's knowledge or permission, "in violation of 21 U.S.C. § 843 and the regulations promulgated to enforce that statute, specifically 21 CFR 13 (1)(D)(a)(2) and 21 CFR13(1)(D)(a)(4)." Dr. Coleman asserted that Ms. Freeza's act of euthanizing her own ferrets at the Humane Society was "in violation of the state statutes and administrative rules regulating the operation of a facility licensed as a Small Animal Clinic Hospital in Tennessee."[6] She further alleged that Ms. Freeza's sale of prescription drugs such as heartworm medication was illegal pursuant to Tennessee Code Annotated section 63-12-106 and Tenn. Comp. R. & Regs. § 1730-1-.21(2)(a).

Dr. Coleman alleged that she had sent numerous emails to Ms. Morgan and attended meetings with Ms. Morgan and others to discuss Ms. Freeza's illegal performance of euthanasia and her unauthorized use of controlled substances. In response to Dr. Coleman's

---

[5] Dr. Coleman also named Ms. Morgan, individually, as a defendant, but the trial court dismissed all claims against Ms. Morgan in her individual capacity, and that ruling is not challenged on appeal.

[6] The Humane Society was issued a permit by the Tennessee Department of Health to operate a small animal clinic hospital on September 18, 2007.

reports, the complaint alleged, Ms. Morgan became increasingly hostile to Dr. Coleman and more defensive of Ms. Freeza. Dr. Coleman alleged that she was discharged from her employment "solely in retaliation for her actions in seeking to further the public good by refusing to participate in and/or for refusing to remain silent" about the aforementioned illegal activities.

Regarding Dr. Coleman's claim for negligent infliction of emotional distress, the complaint asserted that Ms. Morgan developed a hostile attitude in response to Dr. Coleman's complaints and "ignored and undermined [Dr. Coleman's] attempt to exercise her professional skills and judgment on behalf of the animals entrusted to the [Humane Society]." According to the complaint, Ms. Morgan's actions "caused or substantially contributed to animals being placed at risk for suffering and illness," which, in turn, caused Dr. Coleman "to suffer severe emotional distress, as she was prevented on many occasions from intervening to prevent harm to animals she had a professional duty and a personal desire to protect." The complaint alleged that the Humane Society was liable for Ms. Morgan's negligent infliction of emotional distress under the theory of respondeat superior.

Dr. Coleman's complaint alleged that, but for her wrongful termination, she would have been employed with the Humane Society for many years. She acknowledged that reinstatement was not feasible, and as a result, she claimed an entitlement to front pay for future loss of earnings, in the amount of $750,000. She sought $100,000 in damages for emotional distress.

The Humane Society filed an answer, and discovery ensued. Thereafter, the Humane Society filed a motion for summary judgment on all claims asserted by Dr. Coleman. With regard to the retaliatory discharge claims, the Humane Society first argued that Dr. Coleman "will not be able to establish that she was discharged for exercising a constitutional, statutory, or regulatory right." Next, the Humane Society argued that Dr. Coleman would be unable to prove causation to the requisite standard in support of either of her retaliation claims. It argued that Dr. Coleman would be unable to prove that retaliation was a *substantial* factor in her termination, as required for her common law retaliatory discharge claim, and that Dr. Coleman would be unable to prove that retaliation was the *sole* reason for her termination, as required for her statutory retaliatory discharge claim. Next, the Humane Society argued that Dr. Coleman "will not be able to establish a prima facie case of negligent infliction of emotional distress," as she "has not submitted any expert proof showing a severe mental injury attributable to any acts of [the Humane Society]." Finally, the Humane Society argued that Dr. Coleman would be unable to establish her entitlement to front pay.

Dr. Coleman filed a response in which she claimed that the Humane Society's motion for summary judgment "fail[ed] on all counts to affirmatively negate any essential element

of Dr. Coleman's claims," for reasons which we will discuss later in this opinion. Both parties filed lengthy statements of undisputed facts for purposes of summary judgment, and they submitted documentary evidence, such as emails and records, in support of their various positions. The parties also filed supplemental memoranda on several issues as requested by the trial court.

Following a hearing, the trial court entered an order on July 23, 2012, granting in part and denying in part the Humane Society's motion for summary judgment. The trial court granted the Humane Society's motion with regard to the issue of negligent infliction of emotional distress, with the following explanation:

> In a negligent infliction of emotional distress case where there is no other identifiable bodily injury involved, as in this case, the law requires expert medical proof of both the emotional injury and a causal connection between the emotional injury and the allegedly tortious conduct of Defendants; such proof is absent in this case.

The trial court denied the Humane Society's motion regarding the claims for retaliatory discharge, finding that the issue of whether the Humane Society was motivated by retaliation "is a question of pretext, which is a question for the trier of fact and is not appropriate for summary judgment." As for the alternative argument that Dr. Coleman was not exercising a constitutional, statutory, or regulatory right, or otherwise engaged in protected activity, the court found that "reasonable minds could draw differing conclusions on the issue of whether or not [Dr. Coleman's] reporting of illegal activity was in furtherance of public policy sufficient to support a cause of action for retaliatory discharge under Tennessee law." Finally, the trial court found that Dr. Coleman had "sufficiently pled a cause of action with regard to the recovery of front pay, and, therefore, the damage element of her cause of action ha[d] been met satisfactorily to survive the Motion for Summary Judgment."

Dr. Coleman filed a motion for interlocutory appeal with the trial court, moving the court for an order granting her permission to seek an interlocutory appeal in the Court of Appeals with regard to the trial court's decision to grant the Humane Society's motion for summary judgment on the negligent infliction of emotional distress claim for lack of expert proof. The Humane Society also filed a motion for interlocutory appeal with the trial court, seeking permission to pursue an interlocutory appeal of the trial court's order denying its motion for summary judgment on the retaliatory discharge claims. The trial court granted Dr. Coleman's motion and the Humane Society's motion by separate orders entered on December 10, 2012. This Court entered an order granting both parties' applications for interlocutory appeal, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, on March 4, 2013. For purposes of the appeal, we designated Dr. Coleman as the appellant and

the Humane Society as the appellee.

## II. ISSUES PRESENTED

Dr. Coleman presents the following issue for review on appeal:

1. Whether the trial court erred in ruling that expert proof was required to support her negligent infliction of emotional distress claim, where Dr. Coleman's other claimed damages were economic, not physical, and resulted from an intentional tort.

In response, the Humane Society argues that the trial court correctly granted its motion for summary judgment on the claim for negligent infliction of emotional distress, either because the claim was a "stand-alone" claim requiring expert proof, or because, in any event, Dr. Coleman did not suffer a severe emotional injury.

The Humane Society presents numerous additional issues regarding its retaliatory discharge claims, which are not a model of clarity, and therefore we quote from its brief:

2. Whether the trial court erred in ruling that there are sufficient questions of fact from which reasonable minds could draw differing conclusions on the issue of whether or not Dr. Coleman refused to participate in or reported illegal activity in furtherance of public policy sufficient to support a cause of action for retaliatory discharge under Tennessee common law or the Tennessee Public Protection Act, specifically:

    a. Whether there are facts in the record to support Dr. Coleman's claim that she refused to participate in illegal activity;

    b. Whether Dr. Coleman's reports of "overcrowding" in a facility for the care of abused and neglected animals constitutes protected activity; and,
        i. If so, whether it constitutes whistleblowing when the Humane Society already knew of the problem;
        ii. If so, whether it constitutes "whistleblowing" when there is undisputed evidence that the Humane Society was taking steps to correct it.

    c. Whether Dr. Coleman's reports relating to the conduct of vet

assistant Lorie Freeza constitutes protected activity; and

    i.      Whether one can be considered a whistleblower when she wasn't the first to report the alleged illegality;

    ii.      Whether subjective intent matters when determining whether or not one should be considered a good-faith whistleblower under Tennessee law;

    iii.      Whether one who condones or participates in an allegedly illegal activity can be considered a whistleblower for reporting it;

    iv.      Whether complaints to the employer constitute complaints to "someone other than the alleged wrongdoer" under Tennessee law; and

    v.      Whether one whose job it is to oversee and monitor the conduct complained of can be considered a whistleblower for reporting that conduct.

3.      Whether the trial court erred in denying Defendant's Motion for Summary Judgment with respect to Dr. Coleman's claim of retaliatory discharge under Tennessee common law when there is no compelling evidence linking the termination decision to her alleged reports.

4.      Whether the trial court erred in denying Defendant's Motion for Summary Judgment with respect to Dr. Coleman's claim of retaliatory discharge under the Tennessee Public Protection Act when there is undisputed evidence of other reasons for Dr. Coleman's discharge.

5.      Whether, in the event that Dr. Coleman's claim(s) of retaliatory discharge were to survive, the trial court was correct in ruling that the issue of front pay was not appropriate for summary judgment, when the evidence relating to potential economic damages is undisputed.

For the following reasons, we reverse the trial court's order to the extent that it granted summary judgment to the Humane Society on the negligent infliction of emotional distress claim, and we affirm the remainder of the trial court's order denying the motion for summary judgment on the claims for retaliatory discharge, and we remand for further proceedings consistent with this opinion.

### III. STANDARD OF REVIEW

In reviewing the host of issues raised by the parties on appeal, we must keep in mind that we are reviewing the trial court's order on a motion for summary judgment. A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. "When ascertaining whether a genuine dispute of material fact exists in a particular case, the courts must focus on (1) whether the evidence establishing the facts is admissible, (2) whether a factual dispute actually exists, and, if a factual dispute exists, (3) whether the factual dispute is material to the grounds of the summary judgment." *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009).

"The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green*, 293 S.W.3d at 513 (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial."[7] *Martin*, 271 S.W.3d at 83 (citing *Hannan v. Alltel*

---

[7] In *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777, 785 (Tenn. 2010), our Supreme Court held that the *Hannan* standard is applicable to motions for summary judgment on retaliatory discharge claims, not the federal *McDonnell Douglas* framework that was previously used by Tennessee courts. After *Gossett*, the Legislature amended Tennessee Code Annotated section 50-1-304(g) in order to provide a different standard for retaliatory discharge claims than that set forth in *Gossett* and *Hannan*, but the amendment is only effective and applicable to causes of action *accruing* on or after June 10, 2011. *See* 2011 Tenn. Pub. Acts 461. Both parties' briefs on appeal are inconsistent as to the applicable standard, going back and forth between *Hannan* and *McDonnell Douglas*.

We note that in one recent case, *Todd v. Shelby County*, 407 S.W.3d 212, 221 (Tenn. Ct. App. 2012), this Court did apply the recent amendment to section 50-1-304(g) to a retaliatory discharge claim when the lawsuit was *pending* in the trial court when the amendment became effective on June 10, 2011, and the hearing on the summary judgment motion took place after that date. We concluded that the amendment was of a procedural nature and explained that "[r]emedial or procedural statutes apply retrospectively not only to causes of action arising before such acts become law, but to all suits pending when the legislation takes effect, unless the legislature indicates a contrary intention or immediate application would produce an unjust result." *Id.* (quotation omitted). We did not mention, however, that the Legislature *did* indicate a contrary intention in this legislation by specifically stating, "This act shall take effect upon becoming a law, the public welfare requiring it and shall apply to all causes of action *accruing* on or after such effective date." 2011 Tenn. Pub. Acts 461, § 4 (emphasis added).

Thus, in the case at bar, we will not apply the new amendment because this case has been pending

(continued...)

*Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)). In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

If the moving party does make a properly supported motion, the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *Martin*, 271 S.W.3d at 84 (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215). "The nonmoving party may satisfy its burden of production by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06." *Id.* (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n.6). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." *Id.* (citing *McCarley*, 960 S.W.2d at 588).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. *Id.* However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id.* (citing *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

---

[7](...continued)
since 2008. Instead, we will apply **Hannan** to the summary judgment analysis. S*ee* **Webb v. Nashville Area Habitat for Humanity, Inc.**, 346 S.W.3d 422, 437 n.10 (Tenn. 2011) (noting that the amendment is applicable to causes of action accruing on or after June 10, 2011); **Sykes v. Chattanooga Housing Authority**, 343 S.W.3d 18, 26 n.4 (Tenn. 2011) (applying *Hannan* and noting that the amendment is only applicable to causes of action accruing on or after June 10, 2011); **Pierce v. City of Humboldt**, No. W2012-00217-COA-R3-CV, 2013 WL 1190823, at *8 n.7 (Tenn. Ct. App. Mar. 25, 2013) (applying *Hannan* and noting the amendment only applies to cases filed on or after June 10, 2011); **Skaan v. Federal Exp. Corp.**, No. W2011-01807-COA-R3-CV, 2012 WL 6212891, at *4 n.4 (Tenn. Ct. App. Dec. 13, 2012) (same); **Williams v. City of Burns**, No. M2010-02428-COA-R3-CV, 2012 WL 504511, at *2 n.3 (Tenn. Ct. App. Feb. 15, 2012) (applying *Hannan* and finding the amendment "inapplicable" because it applies to causes of action accruing on or after June 10, 2011). The new statute meant to overrule **Hannan** and apply a different standard to summary judgment motions, generally, is likewise inapplicable to this case because it only applies to actions filed on or after July 1, 2011. *See* **Sykes**, 343 S.W.3d at 25 n.2 (citing Tenn. Code Ann. § 20-16-101).

## IV.  DISCUSSION

### A.  *Negligent Infliction of Emotional Distress*

First, we will consider Dr. Coleman's contention that the trial court erred in granting summary judgment to the Humane Society on the basis that there was no expert proof to support her claim for negligent infliction of emotional distress.  As noted above, the trial court provided the following explanation for its decision:

> In a negligent infliction of emotional distress case where there is no other identifiable bodily injury involved, as in this case, the law requires expert medical proof of both the emotional injury and a causal connection between the emotional injury and the allegedly tortious conduct of Defendants; such proof is absent in this case.

Dr. Coleman claims that the trial court erred in concluding that expert proof is required when a plaintiff has no other identifiable "bodily injury" involved.  According to Dr. Coleman, expert proof is only necessary when a plaintiff has alleged no other "damages."  Thus, Dr. Coleman argues that because she asserted claims for retaliatory discharge, her negligent infliction of emotional distress claim was "parasitic" to those claims, not a "stand-alone" claim, and therefore there was no need for expert proof to support her claim.

In response, the Humane Society argues that the trial court correctly concluded that expert proof is required when a plaintiff has no bodily injury.  The Humane Society further argues that a *negligent* infliction of emotional distress claim cannot be parasitic to an *intentional* tort such as retaliatory discharge.  In any event, however, the Humane Society argues that summary judgment was appropriate regardless of the issue of expert proof because, according to the Humane Society, Dr. Coleman did not suffer a severe emotional injury.  The trial court did not make any finding regarding the Humane Society's alternative argument that Dr. Coleman's claimed injury was not sufficiently severe to give rise to a claim for negligent infliction of emotional distress.

In its eleven-page order granting Dr. Coleman's motion for permission to seek an interlocutory appeal, the trial court found that the issues regarding the need for expert proof in support of negligent infliction of emotional distress claims were "not settled," and it remarked that recent "conflicting holdings on this issue [] make it a needlessly murky area for trial courts to navigate."  Thus, we will begin by looking to some of our Supreme Court's noteworthy decisions on negligent infliction of emotional distress.  The Court has noted that "the law of negligent infliction of emotional distress is one of the most disparate and confusing areas of tort law."  ***Camper v. Minor***, 915 S.W.2d 437, 440 (Tenn. 1996).  In

addition, it has noted that the development of the tort of negligent infliction of emotional distress in Tennessee "has been neither smooth nor linear." *Eskin v. Bartee*, 262 S.W.3d 727, 734 (Tenn. 2008).

Historically, a plaintiff was required to show that he or she had sustained a physical injury before being allowed to recover for emotional and mental damages. *Camper*, 915 S.W.2d at 445.

> 'The physical injury requirement served to objectify the inquiry; it assured that the plaintiff's allegations of emotional injury were grounded in an independently verifiable event. Although the degree of physical injury required to substantiate the plaintiff's emotional damages claim was not always consistent, and was sometimes quite negligible, the requirement nevertheless remained central to this area of negligence law.'

*Id.* (quoting *Carroll v. Sisters of St. Francis Health Services, Inc*., 868 S.W.2d 585 (Tenn. 1993)). Eventually, however, the physical manifestation rule "proved to be inflexible and inadequate in practice," as it "completely ignore[d] the fact that some valid emotional injuries simply may not be accompanied by a contemporaneous physical injury or have physical consequences." *Id.* at 446. Accordingly, in *Camper*, the Court concluded that "the time ha[d] come to abandon the rigid and overly formulaic 'physical manifestation' or 'injury' rule," and the Court held that physical injury would "no longer be used to test the validity of a prima facie case of negligent infliction of emotional distress." *Id.* Instead, the Court decided that claims for negligent infliction of emotional distress should be analyzed under a "general negligence" approach, requiring each of the five elements of general negligence: duty, breach of duty, injury or loss, causation in fact, and proximate, or legal, cause. *Id.* "Furthermore," the Court decided, "in order to guard against trivial or fraudulent actions, the law ought to provide a recovery only for 'serious' or 'severe' emotional injury," meaning that "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.* "Finally," the Court held, "the claimed injury or impairment must be supported by expert medical or scientific proof." *Id.*

The Court elaborated on the requirement of medical or scientific proof in *Miller v. Willbanks*, 8 S.W.3d 607, 614-615 (Tenn. 1999). The defendants in that case argued that it was inconsistent to require expert proof of a mental injury for claims for *negligent* infliction of emotional distress but not for mental injury in the context of claims for *intentional* infliction of emotional distress. The Court disagreed:

> Our decision does not change the definition of "serious mental injury," but it does distinguish between the methods of proof for the separate torts. This is so, because, although the injury sustained in both torts is the same, the

circumstances surrounding the infliction of the injury are not.

We recognize that legitimate concerns of fraudulent and trivial claims are implicated when a plaintiff brings an action for a purely mental injury. Thus, safeguards are needed to ensure the reliability of claims for intentional and negligent infliction of emotional distress. These safeguards, however, differ based on the *kind of conduct*, rather than the kind of injury, for which a plaintiff seeks a remedy.

With regard to intentional infliction of emotional distress, the added measure of reliability, i.e., the insurance against frivolous claims, is found in the plaintiff's burden to prove that the offending conduct was outrageous. This is an exacting standard requiring the plaintiff to show that the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d (1965). Such conduct is "important evidence that the distress has existed," *id.* § 45 cmt. j, and from such conduct, more reliable indicia of a severe mental injury may arise. The outrageous nature of the conduct, therefore, vitiates the need for expert testimony in a claim for intentional infliction of emotional distress. The risk of frivolous litigation, then, is alleviated in claims for intentional infliction of emotional distress by the requirement that a plaintiff prove that the offending conduct was so outrageous that it is not tolerated by a civilized society.

In cases of negligent infliction of emotional distress, however, the conduct giving rise to the tort is not marked by extraordinary or outrageous elements inherent in intentional conduct. Thus, concerns with unwarranted claims are not addressed by the kind of conduct that must be proved to obtain damages for emotional distress. In the absence of any reliable indicia of a severe mental injury suggested by the conduct, some safeguard must be imposed to limit frivolous litigation. Accordingly, when the conduct complained of is negligent rather than intentional, the plaintiff must prove the serious mental injury by expert medical or scientific proof. See *Camper*, 915 S.W.2d at 446.

*Id.*

The Court addressed the matter again in ***Estate of Amos v. Vanderbilt University***, 62 S.W.3d 133, 134 (Tenn. 2001), where the Court was required to decide "whether the special proof requirements of *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996), extend to all negligence claims in which damages for emotional distress are sought as an item of compensatory damages." The Court ultimately decided *not* to apply the more stringent

*Camper* proof requirements to all negligence claims resulting in emotional injury. Instead, the Court held that "the special proof requirements of *Camper* apply only to 'stand-alone' claims of negligent infliction of emotional distress." ***Id.*** At the outset of its analysis, the Court explained that its opinion in ***Camper*** "addressed the proper analysis of claims for negligent infliction of emotional distress without an accompanying physical injury." ***Id.*** at 136. The Court explained,

> The special proof requirements in *Camper* are a unique safeguard to ensure the reliability of 'stand-alone' negligent infliction of emotional distress claims. *Camper*, 915 S.W.2d at 440; see also *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn.1999). The subjective nature of 'stand-alone' emotional injuries creates a risk for fraudulent claims. *Miller*, 8 S.W.3d at 614 ("legitimate concerns of fraudulent and trivial claims are implicated when a plaintiff brings an action for a purely mental injury"); see *Camper*, 915 S.W.2d at 440. The risk of a fraudulent claim is less, however, in a case in which a claim for emotional injury damages is one of multiple claims for damages. When emotional damages are a "parasitic" consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to "stand-alone" emotional distress claims.
>
> Even before *Camper*, a plaintiff could recover for emotional injuries as one of several items of compensatory damages. See, e.g., *Smith v. Gore*, 728 S.W.2d 738, 751–52 (Tenn. 1987) (in an action for wrongful pregnancy, plaintiffs could recover damages for medical expenses, pain and suffering, loss of wages, and emotional distress or mental anguish); *Laxton v. Orkin Exterminating Co., Inc.*, 639 S.W.2d 431, 431, 434 (Tenn. 1982) (damages allowed for mental anguish, personal injury, and property damages resulting from the negligent contamination of plaintiffs' water supply); *Roberson v. Univ. of Tenn.*, 829 S.W.2d 149, 152 (Tenn. Ct. App. 1992) (damages for gender discrimination included actual damages, damages for emotional distress, attorneys' fees, costs, and punitive damages). Before *Camper*, however, Tennessee courts did not allow recovery for mental injuries "without accompanying physical injury or physical consequences, or without other independent basis for tort liability." *Laxton*, 639 S.W.2d at 433. The *Camper* holding contemplated a plaintiff who was involved in an incident and received *only* emotional injuries. With its abandonment of the "physical manifestation" rule, the *Camper* Court opened the door for legitimate "stand-alone" claims of negligent infliction of emotional distress. See Laura J. Bradley, Case Note, *Bain v. Wells*, 936 S.W.2d 618 (Tenn.1997), 65 Tenn. L. Rev. 293, 305. The *Camper* holding did not alter the longstanding rule that emotional injuries are compensable if accompanied by additional claims for damages. Imposing the

> more stringent *Camper* proof requirements upon all negligence claims resulting in emotional injury would severely limit the number of otherwise compensable claims. Such a result would be contrary to the intent of our opinion in *Camper*—to provide a more adequate, flexible rule allowing compensation for valid "stand-alone" emotional injury claims. *Camper*, 915 S.W.2d at 446.

*Id.* at 136-37. Applying the "stand-alone" analysis to the facts before it in *Amos*, the Court noted that the plaintiffs had brought a claim for negligent infliction of emotional distress in addition to their claims for negligent failure to warn and wrongful birth. *Id.* at 137. Because their claims for wrongful birth and negligent failure to warn "included a request for damages for emotional injuries stemming from those causes of action," as well as a request for other damages, the plaintiffs' request for damages for emotional injuries was not a "stand-alone" claim subject to the special evidentiary requirements of *Camper*. *Id.* In other words, their claim of emotional damages was not separate from the other claims of negligence, but rather was "parasitic" to those claims, so the claim was properly characterized as a negligence claim that included damages for emotional injuries. "This [was] not a case, like *Camper*, in which the damages alleged [were] for mental anguish alone." *Id.*

More recently, the Supreme Court discussed the *Camper* special proof requirements in *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 528 (Tenn. 2008). The Court began by reviewing and discussing its previous holdings on the issue of negligent infliction of emotional distress. The Court summarized the *Camper* case as holding "that a plaintiff who has not suffered a physical injury must demonstrate through expert medical or scientific proof that he or she has suffered a 'severe' emotional injury." *Id.* According to the Court, "Our holding in *Camper* therefore balance[d] the goals of compensating victims and avoiding fraudulent claims by: 1) allowing a person with emotional injuries to bring NIED claims regardless of whether he or she has suffered any physical injury, and 2) requiring a higher degree of proof for emotional injuries under these circumstances." *Id.*

The Court said that it had "further clarified" the *Camper* holding in the *Estate of Amos* case, when it held that the special proof requirements "are a unique safeguard to ensure the reliability of 'stand-alone' negligent infliction of emotional distress claims." *Id.* at 528-29 (quoting *Amos*, 62 S.W.3d at 136-37). According to the Court, the *Amos* case "recognized a distinction between traditional negligence claims that include damages for emotional injuries and claims that are based solely on NIED." *Id.* at 529. The heightened proof requirements are inapplicable "when emotional damages are a 'parasitic' consequence of negligent conduct that results in multiple types of damages," because "the risk of fraudulent claims is less in a case in which a claim for emotional injury damages is one of multiple claims for damages." *Id.* (quoting *Amos*, 62 S.W.3d at 137).

In *Flax*, the plaintiff was involved in a car accident in which she witnessed the death of her infant son. The Court was required to decide whether the mother's claim for negligent infliction of emotional distress was a stand-alone claim when she had also filed a wrongful death claim on behalf of her deceased son. The Court ultimately concluded that the mother's claim was a stand-alone claim and therefore subject to the *Camper* special proof requirement. *Id*. at 529. The Court explained that a wrongful death claim belongs to the decedent, not to the decedent's beneficiaries. Therefore, the mother's negligent infliction of emotional distress claim was "the only claim that [was] personal to one of the plaintiffs" and was a "stand-alone" claim. *Id.* at 530.

The *Flax* plaintiff argued that her negligent infliction of emotional distress claim was valid because she *had* suffered minor physical injuries during the accident, even though she chose not to bring a claim for those injuries. However, the Court rejected this argument:

> [T]he emotional injuries alleged by [the mother] are not parasitic to the minor injuries she sustained in the accident but rather are the result of witnessing the death of her child. Even if [the mother] had chosen to bring a claim for her minor physical injuries, her NIED claim would remain a "stand-alone" claim because the emotional injuries sustained from witnessing the death of her child are completely unrelated to any physical injuries she may have sustained. Of course, [the mother] would not have been required to meet the *Camper* requirements to recover for any mental and emotional suffering resulting from her own physical injuries. See *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 715 (Tenn. Ct. App.1999) (holding that damages for pain and suffering in a personal injury case may include a variety of mental and emotional injuries that accompany the physical injury). When a plaintiff suffers a physical injury there is some indication that allegations of emotional and mental injuries resulting from that injury are not fraudulent. See *Amos*, 62 S.W.3d at 137. On the other hand, having a potential claim for physical injuries does nothing to ensure the reliability of an NIED claim relating to the emotional injuries resulting from witnessing the death or injury of a third party. Accordingly, there is no good reason to relieve [the mother] of her burden of meeting the *Camper* requirements.

*Id.* at 530.

We now turn to the facts of the case before us. Dr. Coleman's complaint set forth her claim for negligent infliction of emotional distress as her "third cause of action," alleging as follows:

-18-

36. Beginning in April or May of 2007, Defendant Ginger Morgan, acting within the scope of her employment with [the Humane Society], developed a dismissive and hostile attitude toward Plaintiff because of Plaintiff's continued complaints about unsafe and illegal practices at [the Humane Society]. From that time until Plaintiff's termination Defendant Morgan negligently and/or deliberately ignored and undermined Plaintiff's attempt to exercise her professional skills and judgment on behalf of the animals entrusted to [the Humane Society] facility. Some actions of Defendant Morgan caused or substantially contributed to animals being placed at risk for suffering and illness. These actions caused Plaintiff to suffer severe emotional distress, as she was prevented on many occasions from intervening to prevent harm to animals she had a professional duty and a personal desire to protect.

37. The actions of Defendant Ginger Morgan as set forth in Paragraph 36, above, constitute the tort of negligent infliction of emotional distress, rendering [the Humane Society] liable to Plaintiff, under the theory of respondeat superior, for all proximately caused damages prayed for in Paragraph 40, below.

In addition to these allegations, however, Dr. Coleman asserted common law and statutory claims for retaliatory discharge. The sections of Dr. Coleman's complaint setting forth the two causes of action for retaliatory discharge ended by stating, "Consequently, [the Humane Society] is liable to Plaintiff in damages as is set forth in Paragraphs 39, 40 and 41, below." The referenced Paragraph 40 sought $100,000 in damages for negligent infliction of emotional distress. As a result, we interpret Dr. Coleman's complaint as seeking emotional distress damages arising out of her causes of action for retaliatory discharge.

Dr. Coleman argues that her negligent infliction of emotional distress claim was "parasitic" to her retaliatory discharge claims, and therefore, there was no need for expert proof. We agree. In *Estate of Amos*, the Supreme Court explained that there is less risk of fraudulent claims "in a case in which a claim for emotional injury damages is one of multiple claims for damages," and therefore, "[w]hen emotional damages are a 'parasitic' consequence of negligent conduct that *results in multiple types of damages*, there is no need to impose special pleading or proof requirements that apply to 'stand-alone' emotional distress claims." (emphasis added). Because in *Estate of Amos* the plaintiffs' claims for wrongful birth and negligent failure to warn "included a request for damages for emotional injuries *stemming from those causes of action*" (emphasis added), the request for damages for emotional injuries was not a "stand-alone" claim subject to the special evidentiary requirements of *Camper*. Here, Dr. Coleman alleged emotional distress arising out of or

-19-

flowing from her termination or retaliatory discharge; therefore, her negligent infliction of emotional distress claim was "parasitic" to her claims for retaliatory discharge. Because Dr. Coleman asserted a separate viable claim that included damages for emotional injuries, the **Camper** expert proof requirement does not apply.

The trial court held that expert proof is required in "a negligent infliction of emotional distress case where there is no other identifiable bodily injury involved." In other words, the trial court concluded that whether a NIED claim is a stand-alone claim depends upon whether the plaintiff suffered a physical injury. We recognize, as the trial court noted, that some of the recent language addressing this issue is difficult to reconcile.[8] *See, e.g.*, **Rogers v. Louisville Land Co.**, 367 S.W.3d 196, 206 n.10 (Tenn. 2012) ("When the claim for negligent infliction of emotional distress is a 'stand-alone' claim, i.e., one for emotional disturbance alone in the absence of a physical injury, the serious or severe mental injury must be proven 'through expert medical or scientific proof.'") (quoting *Flax*, 272 S.W.3d at 528); **Eskin v. Bartee**, 262 S.W.3d 727, 735 (Tenn. 2008) ("The Court has defined a 'stand-alone' negligent infliction of emotional distress claim as a claim that seeks recovery only for emotional injuries and that is not accompanied by 'additional claims for damages.'") (quoting *Amos*, 62 S.W.3d at 137). However, as we recently explained in **Boals v. Murphy**, No. W2013-00310-COA-R3-CV, 2013 WL 5872225, at *13 (Tenn. Ct. App. Oct. 30, 2013), the fact that a particular claim seeks damages "based on nonphysical injuries . . . does not necessarily mean that the claims are 'stand alone' NIED claims." The existence of a physical injury is not determinative. Even before *Camper v. Minor*, a plaintiff could recover for emotional injuries "as one of several items of compensatory damages," but "Tennessee courts did not allow recovery for mental injuries 'without accompanying physical injury or physical consequences, *or without other independent basis for tort liability*.'" **Estate of Amos**, 62 S.W.3d at 137 (citing *Laxton*, 639 S.W.2d at 433) (emphasis added). The **Estate of Amos** Court listed some examples of cases in which emotional injuries were alleged as one of several bases for compensatory damages, including **Roberson v. Univ. of Tenn.**, 829 S.W.2d 149, 152 (Tenn. Ct. App. 1992) (noting that damages for gender discrimination included actual damages, damages for emotional distress, attorneys' fees, costs, and punitive damages). The Court then noted that "[t]he *Camper* holding did not alter the longstanding rule that emotional injuries are compensable if accompanied by additional claims for damages." **Estate of Amos**, 62 S.W.3d at 137. As a result, we have interpreted **Estate of Amos** as holding "that the *Camper* safeguards apply only to 'stand alone' claims for NIED and do not apply to cases in which the plaintiff's emotional injury is 'parasitic' to *other types of claims*

---

[8] This Court has recently observed that "[i]t may be simple to state the general rule requiring expert proof in NIED cases, but applying it is not so simple, particularly in cases in which the plaintiff asserts a claim for NIED along with other claims involving different torts and different types of damages." **Boals v. Murphy**, No. W2013-00310-COA-R3-CV, 2013 WL 5872225, at *8 (Tenn. Ct. App. Oct. 30, 2013).

*or injuries.*" **Boals**, 2013 WL 5872225, at *9.  For example, in **Riley v. Whybrew**, 185 S.W.3d 393, 400 (Tenn. Ct. App. 2005), this Court concluded that a negligent infliction of emotional distress claim that accompanied a nuisance claim was not a stand-alone claim, and therefore the *Camper* expert proof requirement was inapplicable, despite the appellee's contention that expert proof was required in the absence of an accompanying *physical* injury. And in **Boals**, this Court concluded that the plaintiffs' claim for "negligent infliction of emotional distress" was not a stand-alone claim because the plaintiffs had also alleged "a variety of negligence claims for which several types of damages [were] recoverable other than emotional injuries."  Specifically, the plaintiffs' claims for negligence per se, negligent mutilation, violation of the common law, breach of contract, and violation of the TCPA constituted "independent bases for tort liability," and they were "related to the injuries that the Plaintiffs' NIED claim [sought] to redress." 2013 WL 5872225, at *14.  Finally, we note that the Supreme Court has specifically recited the definition of "a 'stand-alone' negligent infliction of emotional distress claim as a claim that seeks recovery only for emotional injuries and that is not accompanied by 'additional claims for damages.'" **Eskin**, 262 S.W.3d at 735.

Applying these principles to the facts before us, we find that Dr. Coleman's claim for negligent infliction of emotional distress is not a stand-alone claim because she also alleged other independent bases for tort liability, namely, statutory and common law causes of action for retaliatory discharge.  The fact that Dr. Coleman did not allege a physical injury is not determinative.  *See* **Boals**, 2013 WL 5872225, at *13.

Finally, we note the Humane Society's argument that a claim for negligent infliction of emotional distress can only be parasitic to another negligence-based tort and cannot be parasitic to an intentional tort such as retaliatory discharge.  However, the Humane Society does not present any persuasive argument regarding why a negligent infliction of emotional distress claim that accompanies an *intentional* tort should require expert proof, when a negligent infliction of emotional distress claim that is parasitic to a *negligence* claim does not.  In **Estate of Amos**, the Supreme Court stated:

> The subjective nature of "stand-alone" emotional injuries creates a risk for fraudulent claims. [citations omitted].  The risk of a fraudulent claim is less, however, in a case in which a claim for emotional injury damages is one of multiple claims for damages. When emotional damages are a "parasitic" consequence of negligent conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to "stand-alone" emotional distress claims.  See *Kush v. Lloyd*, 616 So.2d 415, 422–23 (Fla.1992); see also *Naccash v. Burger*, 223 Va. 406, 290 S.E.2d 825, 831 (1982); *Phillips v. United States*, 575 F.Supp. 1309, 1318–19 (D.S.C.1983).

-21-

62 S.W.3d at137 (citations omitted). The Humane Society contends that the "critical" term in this passage is "negligent" conduct, referencing the sentence, "When emotional damages are a 'parasitic' consequence of *negligent* conduct that results in multiple types of damages, there is no need to impose special pleading or proof requirements that apply to 'stand-alone' emotional distress claims." *Id.* (Emphasis added). We find no indication that this was the critical point of the Court's analysis, however. The Supreme Court was simply discussing the issue of stand-alone claims in the context of deciding whether expert proof should be required for *all negligence claims* resulting in emotional injury. Thus, the Court explained that there was no need for special proof requirements when emotional damages are a parasitic consequence of negligent conduct resulting in multiple types of damages, but that special proof is required for "stand-alone" claims. In other words, the Court recognized a distinction between traditional negligence claims that include damages for emotional injuries and claims that are based solely on NIED. *See Flax*, 272 S.W.3d at 529 (explaining the holding in *Estate of Amos*). The plaintiffs' claim of emotional damages in *Estate of Amos* was not separate from the other claims of negligence, but rather was "parasitic" to those claims. *See id.* We do not read the Court's statement in *Estate of Amos* as holding that there is no need for expert proof only when emotional damages are parasitic to *negligent* conduct resulting in multiple types of damages. In fact, the *Kush* case that the Supreme Court cited for the sentence at issue actually states, "Prosser and Keeton state that the impact doctrine should not be applied where emotional damages are an additional *'parasitic' consequence of conduct that itself is a freestanding tort* apart from any emotional injury." *Kush v. Lloyd*, 616 So.2d 415, 422-23 (Fla. 1992) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 54, at 361–65 (5th ed. 1984)) (emphasis added).[9]

As noted above, the *Estate of Amos* Court went on to explain that even before *Camper*, a plaintiff could recover for emotional injuries "as one of several items of compensatory damages," but not without "accompanying physical injury or physical consequences, *or* without other *independent basis for tort liability*." 62 S.W.3d at 137 (Emphasis added). As an example, the Court referenced *Roberson v. Univ. of Tenn.*, 829 S.W.2d 149, 152 (Tenn. Ct. App. 1992), which allowed emotional distress damages for gender discrimination. According to the Court, "The *Camper* holding did not alter the longstanding rule that emotional injuries are compensable if accompanied by *additional claims for damages*." (emphasis added). In conclusion, the Court succinctly stated, "Plaintiffs . . . who seek damages for emotional injuries as one of multiple claims for damages, therefore, are not required to meet the special proof requirements under *Camper*." *Id.* at 139.

---

[9] The *Kush* Court was deciding whether parents could recover damages for alleged mental anguish arising out of a wrongful birth claim. 616 So.2d. at 422-23.

In sum, we conclude that the trial court erred in holding that Dr. Coleman was required to submit expert proof in support of her claim for negligent infliction of emotional distress. Dr. Coleman claimed that the Humane Society was liable for emotional damages suffered as a result of her alleged retaliatory discharge. Therefore, her NIED claim was parasitic to her claims for retaliatory discharge. Even though they may be considered intentional torts, the retaliatory discharge claims provided an "independent basis for tort liability" such that the NIED claim was not a stand-alone claim. *Estate of Amos*, 62 S.W.3d at 137. Dr. Coleman's claimed emotional injury was related to the retaliatory discharge claims she asserted, and the retaliatory discharge claims served the purpose of demonstrating the reliability of Dr. Coleman's claim for emotional distress. *Flax*, 272 S.W.3d at 530. In other words, they provided some indication that her allegations of emotional and mental injuries resulting from the retaliatory discharge are not fraudulent.

Because we have found that Dr. Coleman's NIED claim was not a stand-alone claim, we likewise find that the trial court erred in granting summary judgment to the Humane Society on this claim due to the lack of expert proof.[10] We reverse the trial court's order granting summary judgment to the Humane Society on this issue and remand for further proceedings.[11]

## B. *Retaliatory Discharge*

Tennessee has long adhered to the doctrine of employment-at-will, which recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty

---

[10] The Humane Society is not precluded from raising this issue to the trial court again if, at some point, Dr. Coleman's retaliatory discharge claims are disposed of prior to trial, either by summary judgment or otherwise. *See Boals*, 2013 WL 5872225, at *14 n.9.

[11] The Humane Society raised an alternative argument on appeal regarding whether Dr. Coleman's alleged emotional injury was "serious or severe" enough to support a claim for NIED, and it claimed that it would be entitled to summary judgment on this basis as well. However, the trial court did not grant summary judgment on this basis, nor did it make any findings regarding these arguments. Furthermore, this issue was not addressed in the application for interlocutory appeal filed by Dr. Coleman on the issue of negligent infliction of emotional distress, nor did the trial court mention the issue in its order granting leave to seek an interlocutory appeal on this issue. "In an interlocutory appeal, as well as in an appeal as of right, the appellate court considers only questions that were actually adjudicated by the trial court." *Shaffer v. Memphis Airport Authority, Service Management Systems, Inc.*, No. W2012-00237-COA-R9-CV, 2013 WL 209309, at *4 (Tenn. Ct. App. Jan. 18, 2013) (citing *In re Estate of Boykin*, 295 S.W.3d 632, 636 (Tenn. Ct. App. 2008) ("At the appellate level, 'we are limited in authority to the adjudication of issues that are presented and decided in the trial courts.") "To do otherwise would render the interlocutory appeal a request for an advisory opinion." *Id.* Accordingly, we decline to address this issue in the first instance on appeal.

of a legal wrong. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 534-35 (Tenn. 2002); *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). By statute and case law, however, some restrictions have been imposed on the right of an employer to terminate an at-will employee. *Stein*, 945 S.W.2d at 716. Our Supreme Court first recognized a common-law retaliatory discharge cause of action in *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 442 (Tenn. 1984), where an employee was discharged for exercising his rights under the workers' compensation law. The Court found that to allow an employee to be discharged for filing a workers' compensation claim would "completely circumvent" the legislative scheme; thus, a retaliatory discharge cause of action was necessary to carry out the legislature's intent. *Id.* at 444-45. The Supreme Court later clarified, however, that an action for retaliatory discharge is a limited exception to the employment-at-will doctrine, which "cannot be permitted to consume or eliminate the general rule." *Chism v. Mid-South Milling Co., Inc.*, 762 S.W.2d 552, 556 (Tenn.1988). "To be liable for retaliatory discharge," the Court explained, "the employer must violate a clear public policy. Usually this policy will be evidenced by an unambiguous constitutional, statutory or regulatory provision." *Id.* Thus, for a common law retaliatory discharge claim, the employee has the burden of proving four elements at trial:

> (1) that an employment-at-will relationship existed;
> (2) that the employee was discharged;
> (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and
> (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Gossett*, 320 S.W.3d at 781 (citing *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002)).

There is also a statutory exception to the employment-at-will doctrine. "The Whistleblower Act, Tennessee Code Annotated section 50-1-304, was enacted as part of the Tennessee Public Protection Act of 1990." *Sykes*, 343 S.W.3d at 26. It provides, in relevant part:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
> . . .
> (d)(1) Any employee terminated in violation of subsection (b) shall have a

cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304. The TPPA "increases the burden of proof to require the plaintiff to demonstrate that his whistleblowing behavior was the *sole* reason for his termination, in contrast with the 'substantial factor' requirement of the common law." **Guy**, 79 S.W.3d at 537. Thus, a claimant under the Whistleblower Act has the burden of proving the following four elements to prevail on his or her statutory retaliatory discharge claim:

(1) the plaintiff was an employee of the defendant;
(2) the plaintiff refused to participate in or remain silent about illegal activity;
(3) the defendant employer discharged or terminated the plaintiff's employment; and
(4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

**Sykes**, 343 S.W.3d at 27. The statute defines "illegal activities" as "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3).

Here, the Humane Society filed a motion for summary judgment alleging that Dr. Coleman cannot prove that she refused to participate in or remain silent about illegal activity, or activity that violated a clear public policy, as required to prove her retaliatory discharge claims. Alternatively, the Humane Society argued that Dr. Coleman cannot prove that her complaints were the sole reason, or even a substantial factor, in the decision to terminate her. We will address each of these arguments in turn. However, we must first decide precisely what type of retaliation claim Dr. Coleman has asserted. As noted above, the TPPA provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, *or* for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304 (emphasis added). Similarly, a common law retaliatory discharge action "can arise when an employee is discharged *either* for refusing to remain silent about an illegal activity *or* for refusing to participate in an illegal activity." **Gossett**, 320 S.W.3d at 787 (emphasis added). The two types of claims "are similar but distinct." **VanCleave v. Reelfoot Bank**, No. W2008-01559-COA-R3-CV, 2009 WL 3518211, at *7 (Tenn. Ct. App. Oct. 30, 2009). A refusal to participate claim is treated differently than a refusal to remain silent claim for certain purposes.

Dr. Coleman alleged in her complaint that she was terminated "in retaliation for her actions in seeking to further the public good by refusing to participate in and/or for refusing to remain silent about" Ms. Freeza's unauthorized performance of euthanasia at the Humane

Society without being certified to do so, Ms. Freeza's act of bringing her personally owned pet ferrets to the Humane Society and euthanizing them, and Ms. Freeza's unauthorized use of euthanasia drugs issued to Dr. Coleman without Dr. Coleman's knowledge or consent.[12] The Humane Society asserts that because "no one ever told [Dr. Coleman] she had to participate in any illegal activity," her retaliatory discharge claim cannot be based upon a refusal to participate. According to the Humane Society, "[t]here is simply no evidence in the present case to support Dr. Coleman's conclusory allegation that the Humane Society sought to have her participate in illegal activity." We disagree.

First of all, it is not necessary for an employer to have *expressly* stated to an employee that he or she must "participate in an illegal activity," or must remain silent about it, in order for the employee to pursue a retaliatory discharge claim. *Mason v. Seaton*, 942 S.W.2d 470, 475-76 (Tenn. 1997) ("It is axiomatic that an employer who is engaged in illegal activity does not want that activity reported . . . . Requiring an explicit instruction by the employer as an essential component of the cause of action would defeat the purpose of the statute. . . . [A]n employer would never be liable for discharging an employee for reporting illegal activity so long as the employer had not expressly forbade the employee from reporting the activity."); *Sykes v. Chattanooga Housing Authority*, No. E2008-00525-COA-R3-CV, 2009 WL 2365705, at *13 (Tenn. Ct. App. July 31, 2009) *aff'd* 343 S.W.3d 18 (Tenn. 2011) (stating that there is no requirement that a plaintiff show an instruction from his or her employer to participate in illegal activities).

Moreover, the Humane Society has not otherwise demonstrated that Dr. Coleman will not be able to prove a refusal to participate claim at trial. The euthanasia drugs at issue were classified as Schedule II and Schedule III substances and sold to Dr. Coleman under her federal DEA license, making her strictly accountable for them under both federal and state law. These controlled substances were kept in a locked cabinet. Dr. Coleman's complaint

---

[12] In their briefs on appeal, the parties present various arguments regarding Dr. Coleman's complaints about other circumstances at the Humane Society, such as its "overcrowding" and Ms. Freeza's sale of heartworm medication. However, a close examination of Dr. Coleman's complaint reveals that she based her claims of retaliatory discharge on the allegation that she was terminated for refusing to participate in or remain silent "about the activities set forth in Paragraphs 22, 23, 24, 25, and 26, which activities were illegal under the state and federal statutes and regulations cited in said paragraphs, all of which are intended to protect the public health, safety and welfare." Paragraphs 22 through 26 of the complaint set forth allegations regarding Ms. Freeza's unauthorized performance of euthanasia, her unauthorized use of controlled substances for euthanasia, and her euthanasia of ferrets belonging to her, not to the Humane Society. There was no mention in these paragraphs of overcrowding, the sale of heartworm medication, and the like, and the complaint was never amended to allege that Dr. Coleman's complaints about these practices were the basis for her termination. Therefore, we will limit our review on appeal to the specific allegations of the complaint, not necessarily the issues presented in the briefs on appeal.

was that Ms. Freeza was removing the controlled substances issued to Dr. Coleman, without Dr. Coleman's knowledge or consent, and using them to illegally euthanize animals belonging to the Humane Society and others. It is undisputed that, as staff veterinarian, it was Dr. Coleman's legal responsibility to ensure that the Humane Society was in compliance with veterinary standards and procedures. Dr. Coleman claims that she initially complained to Ms. Morgan about these practices, and that Ms. Morgan not only ignored the complaints but defended Ms. Freeza. Dr. Coleman then addressed the board of directors about the issue. Viewing the evidence in the light most favorable to Dr. Coleman, as the nonmoving party, and drawing all reasonable inferences in her favor, we find that the aforementioned illegal practices occurring at the Humane Society involved Dr. Coleman in such a way that her continued complaints about them can be characterized as a refusal to participate in and a refusal to remain silent about the activities. Specifically, Dr. Coleman refused to participate in the continuing practice at the Humane Society by which Ms. Freeza was using Dr. Coleman's medications to illegally euthanize animals. In short, the Humane Society has not shown that Dr. Coleman *cannot* establish a refusal to participate claim *at trial*, and therefore, it is not entitled to summary judgment on this issue.

### 1. Protected Activity

The Humane Society presents several issues on appeal in support of its assertion that Dr. Coleman did not engage in "protected activity" within the meaning of retaliatory discharge law. The Humane Society claims that the trial court erred in finding that there were genuine issues of material fact and that "reasonable minds could draw differing conclusions on the issue of whether or not [Dr. Coleman's] reporting of illegal activity was in furtherance of public policy sufficient to support a cause of action for retaliatory discharge under Tennessee law."

As we explained earlier, an action for retaliatory discharge is a limited exception to the employment-at-will doctrine, which "cannot be permitted to consume or eliminate the general rule." *Chism*, 762 S.W.2d at 556. Accordingly, in order to be liable for retaliatory discharge, "the employer must violate a clear public policy," which usually "will be evidenced by an unambiguous constitutional, statutory or regulatory provision." *Id.* "This element sufficiently limits the retaliatory discharge cause of action to only those cases in which a discharge violates public policy." *Gossett*, 320 S.W.3d at 789 (citing *Chism*, 762 S.W.2d at 557). "[M]anagement has the right to terminate an employee over management and policy decisions, so long as the employer does not violate any clearly established public policy in doing so." *Chism*, 762 S.W.2d at 555. "Neither the statutory nor the common-law whistleblowing claims are triggered by simple disputes or arguments between employees and their supervisors regarding workplace procedures." *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007).

According to our Supreme Court, for a common law retaliatory discharge claim, the employee has the burden of proving that he or she was terminated for attempting "to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision[.]" *Gossett*, 320 S.W.3d at 781. Under the TPPA, the employee must prove termination for refusing to participate in or remain silent about illegal activities, meaning, "activities that are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Tenn. Code Ann. § 50-1-304(a)(3). "To be clear, under both the statute and the common law, the plaintiff must assert that his or her whistleblowing activity 'serves a public purpose [that] should be protected.'" *Guy*, 79 S.W.3d at 538 n.4.

### a. Subjective Intent

In its motion for summary judgment, the Humane Society conceded that in October 2007, Dr. Coleman brought to the attention of the Humane Society's board of directors violations of Tennessee's Veterinary Practice Act, Tenn. Code Ann. § 63-12-101, et seq., and the Non-livestock Animal Humane Death Act, Tenn. Code Ann. § 44-17-301, et seq., as well as the regulations pertaining to those Acts.[13] However, the Humane Society claimed that Dr. Coleman's "concern in reporting these violations was her own personal interest in protecting her veterinary license and reputation," not the public welfare, and therefore, her retaliatory discharge claims must fail. The Humane Society pointed out that in an email sent by Dr. Coleman after she complained to the board of directors, she stated:

> Thank you for providing the opportunity to express my grievances and concerns regarding the conduct of Lorie Freeza. As stated in the meeting, *I cannot tolerate unethical and possibly illegal activities which affect my license as a veterinarian, holder of a D.E.A. license, unfounded allegations, and personal attacks deleterious to my reputation.* These issues have been previously addressed with management and thus far no positive action has been taken to correct the problems. In the meeting, upon request, I made a recommendation on Lorie Freeza's employment status. The resolution and decision is now in your hands.

---

[13] Shortly after Dr. Coleman's termination, the Humane Society and its employees were investigated by the Tennessee Department of Health Related Boards for complaints dealing with the illegal use of drugs and actions of employees. The Humane Society received a warning letter from the Board stating that regulatory violations had occurred and that the management had been aware of them. Dr. Coleman was not disciplined.

(Emphasis added). Thus, the Humane Society claimed that Dr. Coleman was motivated by personal interest. In response to the motion for summary judgment, Dr. Coleman conceded that she was "motivated *partly* by wanting to protect her professional license and avoid trouble with the federal Drug Enforcement Agency," but, she claimed she was also "strongly motivated by her concern for the animals she saw suffering because of illegal and unsafe practices, and also by her interest as a licensed professional in preventing the illegal practice of veterinary medicine and the illegal use of controlled substances and other prescription drugs." Dr. Coleman claimed that, under Tennessee law, she can pursue a retaliatory discharge claim so long as her "sole motive" was not personal or private interest.

In *Guy*, our Supreme Court stated that an employee asserting a retaliatory discharge claim "must assert that his or her whistleblowing activity 'serves a public purpose [that] should be protected. So long as employees' actions are not merely private or proprietary, but instead *seek to further the public good,* the decision to expose illegal or unsafe practices should be encouraged.'" 79 S.W.3d at 538 n.4 (emphasis in *Guy*). The precise meaning of this statement has been the subject of some debate. In *Bright v. MMS Knoxville, Inc.*, No. M2005-02668-COA-R3-CV, 2007 WL 2262018, at *4 (Tenn. Ct. App. Aug. 7, 2007), the Middle Section of this Court stated:

> It is the court's task to determine whether the whistleblowing activity that brought to light an illegal or unsafe practice has furthered an important public policy interest. *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d at 538. Toward that end, *it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest. Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d at 538 n. 4.

*Id.* (emphasis added). In *Bright*, the Court found that a medical supply company technician's conversation with the manager of an assisted living facility about a patient at the facility who was smoking near oxygen did not constitute the reporting of illegal activities for the purpose of a common-law or statutory retaliatory discharge claim. *Id.* at *1. The Court first noted that the regulations that were allegedly violated pertained to the facility, not to the individual smoker, and the facility was not in violation of the cited regulations because it prohibited smoking. *Id.* at *5. In addition, the Court went on to note that it was "hard to reconcile [the employee's] claim for whistleblower status with his testimony regarding the event. [The employee] testified that his 'legal concern' was that he or [his employer] could incur liability for any damage caused by [the patient's] smoking." *Id.* The Court explained:

The circumstances of this case present a well-intentioned employee who sought to avoid legal responsibility for a potentially hazardous situation. This simply does not fall within the scope of the protection provided by the statutory or common-law actions for retaliatory discharge.

Throughout this matter, no one has disputed that [the employee's] decision to speak with [the facility's] management stemmed from a good faith attempt to prevent a safety hazard. Unfortunately, [the employee] by-passed [his employer's] policy that management should address these matters when they arise and thereby placed [his employer] in an uncomfortable position vis-à-vis one of its customers. In Tennessee, employers may discharge at-will employees for good reason, bad reason, or no reason without being guilty of a legal wrong. *Stein v. Davidson Hotel Co.*, 945 S.W.2d at 716. While there may be room to question whether [the employee] should have been terminated, reasonable persons cannot disagree that [the employer's] decision was not based on an illegal reason.

*Id.* In the case before us, the Humane Society relies upon the **Bright** Court's statement that "it is essential that the employee's attempt to expose illegal or unsafe practices do more than merely advance the employee's private interest." The Humane Society interprets this statement to mean that "subjective intent matters."

This Court has questioned the importance of an employee's "subjective intent" in the retaliatory discharge analysis. In **VanCleave v. Reelfoot Bank**, No. W2008-01559-COA-R3-CV, 2009 WL 3518211 (Tenn. Ct. App. Oct. 30, 2009), the plaintiff was a bank employee who refused a customer's request to open an account in a manner that she believed was illegal. The trial court granted summary judgment to the bank on the plaintiff's retaliatory discharge claims, noting that the employee had conceded that her intent was to protect the bank, and/or her supervisor, "not the public." *Id.* at *7. Effectively, the trial court held that the employee was required to prove that she was motivated by a desire to protect the public, as opposed to protecting her supervisor, the bank, or herself. *Id.* On appeal, we acknowledged the Supreme Court's statement in **Guy** that as "long as employees' actions are not merely private or proprietary, but instead *seek to further the public good,* the decision to expose illegal or unsafe practices should be encouraged." We said, "To the extent that [this statement] may be interpreted as requiring a plaintiff in a retaliatory discharge case to show subjective intent to further the public good, some clarification is in order." *Id.* We first pointed out that **Guy** only involved a whistleblowing claim, not a refusal to participate

claim.[14] Thus, we concluded that, to the extent that the Court's statement "can be read as requiring that the plaintiff's report of the illegal activity be motivated by a desire to further the public good, such a statement of the law would be limited to a whistleblowing claim." *Id.* at *8. We explained that "it would be anomalous to hold that the plaintiff must show that, in refusing to *participate* in the alleged illegal activity, she was motivated by an intent to protect the public as opposed to protecting herself or her employer." *Id.* "Indeed, retaliatory discharge claims involving refusal-to-participate often acknowledge that the plaintiff refused the employer's demand that he participate in the alleged illegal activity out of concern that the plaintiff himself could be penalized for doing so." *Id.* (citing *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 824-25 (Tenn. 1994) (noting that violation of regulations promulgated under the Tennessee Motor Carriers Act may expose employee drivers to criminal penalties); *Franklin v. Swift Transp. Co., Inc.*, 210 S.W.3d 521, 529-30 (Tenn. Ct. App. 2006) (operating defendant employer's truck with a photocopy of the cab card may expose plaintiff employee to fines, penalties and delay on the road); *Wilkerson v. Standard Knitting Mills*, Inc., 1989 WL 120298, at *1, 7 (Tenn. Ct. App. Oct.11, 1989) (Sanders, P.J., dissenting) (following employer's instruction to avoid sending employees to outside medical treatment would result in criminal liability for violation of OSHA)). Thus, we concluded that in a refusal to participate retaliatory discharge claim, "[i]t is sufficient that the plaintiff show that the alleged illegal activity implicates important public policy concerns; . . . she need not show a subjective intent to further the public good." *Id.* In other words, "intent to further the public good is not a required element" of a retaliatory discharge claim based upon a refusal to participate. *Id.* at *1. As a result, the plaintiff-employee's statement that she refused to open the bank account in order to protect either her supervisor or the bank was not fatal to her claim of retaliatory discharge. *Id.* at *8.

> We further observed in *VanCleave*,
>
> Requiring that the plaintiff show subjective intent to further the public good, even for a whistleblowing claim, would appear to be problematic. A whistleblowing claim could arise from a plaintiff's mandatory duty to report illegal activity, where the plaintiff was motivated only by a desire to perform his mandated duty and thus keep himself out of trouble. See, e.g., *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852 (Tenn.2002). *Crews* involved a permissive duty to report illegal conduct, but the Court referenced circumstances in which a plaintiff may have a mandatory duty to report illegal conduct. *Id.* at 865 n. 6.

---

[14] We also noted that the Court's statement was technically dicta, as it was unnecessary to the Court's holding in *Guy*. *Id.* at *8 n.8.

We concluded that it is "more likely" that it is "the *reporting* [that] must further the public good, as opposed to furthering the plaintiff's private interest," rather than a need for the *plaintiff* to have a subjective intent to promote public welfare. *Id.* at *8 n.10. Indeed, in *Guy*, the Supreme Court stated that the "inquiry focuses on whether some important public policy interest embodied in the law has been furthered by the whistleblowing activity." *Guy*, 79 S.W.3d at 538 (quotation omitted).

In Dr. Coleman's case, it clearly is not necessary for her to show a subjective intent to promote the public good in order to pursue her claims based upon refusal to participate. *See VanCleave*, 2009 WL 3518211, at *8; *see also Williams v. Greater Chattanooga Public Television Corp.*, 349 S.W.3d 501, 515 (Tenn. Ct. App. 2011) ("under the holding of *VanCleave*, [the plaintiff in a refusal to participate case] is not required to show that her motivation in avoiding violation of a statute was concern for the public"). As for Dr. Coleman's claims based upon a refusal to remain silent, we will focus our inquiry on whether some important public policy interest, embodied in the law, was furthered by the whistleblowing activity. *See Guy*, 79 S.W.3d at 538. We will also consider whether Dr. Coleman's actions were "*merely* private or proprietary" (emphasis added), to the extent that her subjective intent may be considered relevant to our analysis of this issue. *See id.* at 538 n.4.

Dr. Coleman admitted that her motivation in reporting Ms. Freeza's conduct was "partly" out of a concern for her own license, reputation, and liability. The Humane Society argues that, based upon this evidence, it has affirmatively negated Dr. Coleman's claim that her reporting of illegal activity was in furtherance of the public good. We disagree. The Humane Society does not cite any authority to suggest that an employee must be motivated *solely* by a desire to promote the public good without *any* concern for the employee's own interest. In *Lawson v. Adams*, 338 S.W.3d 486, 488 (Tenn. Ct. App. 2010), an operator of construction equipment was fired after he objected to driving allegedly unsafe equipment. The trial court found that he could not pursue a claim for retaliatory discharge because he had failed to establish that his efforts "to bring to light an illegal or unsafe practice furthered an important public policy interest . . . rather than simply his personal interest." *Id.* The Court of Appeals disagreed, noting that driving unsafe equipment on public roads "put *not only* Plaintiff at risk, *but also* everyone else who was using the public roads being traveled by Plaintiff while he was driving this allegedly defective equipment." *Id.* at 498 (emphasis added). As such, the Court "disagree[d] with the Trial Court's conclusion that Plaintiff was

protecting *only* his personal interest."[15]  ***Id.*** (emphasis added).  Thus, to the extent that the employee's subjective intent is relevant to the analysis, ***Lawson*** suggests that it is not necessary for the employee to have acted *solely* with a purpose to further the public good, without *any* consideration of his or her own personal interest.

In the case before us, the Humane Society admitted that Dr. Coleman brought to the attention of the board of directors violations of Tennessee's Veterinary Practice Act, Tenn. Code Ann. § 63-12-101, et seq., and the Non-livestock Animal Humane Death Act, Tenn. Code Ann. § 44-17-301, et seq., as well as the regulations pertaining to those Acts.[16]  We find that regardless of whether Dr. Coleman was "partly" motivated by concern for her professional license, liability, and reputation, the Humane Society has not demonstrated that Dr. Coleman *cannot prove at trial* that her whistleblowing activity furthered some important public policy interest embodied in the law.  Thus, the Humane Society was not entitled to summary judgment based on this issue.[17]

### b.    The Recipient of Dr. Coleman's Reports

Next, the Humane Society asserts that Dr. Coleman's retaliatory discharge claims cannot survive because she did not report the illegal activity to "an outside authority."  Dr. Coleman reported Ms. Freeza's actions to the Humane Society's executive director, Ms. Morgan, and also to the board of directors.  However, it is undisputed that she did not report Ms. Freeza's conduct to any "outside authority."  Therefore, we must consider whether such a report is a prerequisite to recovery under Tennessee law.

---

[15] The Court in ***Lawson*** affirmed summary judgment to the employer on the employee's refusal to remain silent claim, on other grounds.  Its discussion of the employee's personal motivation came in the context of its discussion of the refusal to participate claim.  Nevertheless, the Court's analysis demonstrates that when considering subjective intent, it is not necessary for the employee to have acted with absolutely no concern for his own personal interest.

[16] Again, the Humane Society raised several issues on appeal regarding whether Dr. Coleman's complaints about overcrowding would constitute "illegal activity" within the meaning of retaliatory discharge law.  Because Dr. Coleman's complaint did not cite her reports of overcrowding as the cause of her alleged retaliatory discharge, we need not consider whether overcrowding would constitute an illegal activity.

[17] The Humane Society alternatively argued in its brief on appeal that the reporting of Ms. Freeza's conduct did not serve the public good because Ms. Freeza was only euthanizing animals belonging to the Humane Society, and she was not holding herself out to the public as a licensed veterinarian.  We reject the suggestion that there was no public policy interest involved simply because the illegally euthanized animals belonged to the Humane Society.

Our Supreme Court has held that "an employee alleging retaliatory discharge for refusal to *participate* in an illegal activity need not report the illegality." ***Gossett***, 320 S.W.3d at 779. "A case alleging a refusal to participate does not require that silence be broken for a claim to exist, and reporting therefore is not integral to the claim." ***Id.*** at 788. Simply put, "there is no reporting requirement for common law and statutory claims of wrongful discharge based upon refusal to participate in illegal activities." ***Lawson***, 338 S.W.3d at 497. Therefore, Dr. Coleman's refusal to participate claims are clearly not barred by her failure to report to an "outside authority."

"In a 'whistleblowing' case, in which a failure to remain silent is alleged, the nature of the claim asserts that silence was broken." ***Gossett***, 320 S.W.3d at 788. "The employee has no cause of action unless the employee shows that the reporting furthered some clear public interest." ***Id.*** The employee "need not report suspected illegal activities directly to law or regulatory enforcement officials," but he or she "must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities." ***Bright***, 2007 WL 2262018, at *4 (citing *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 371 & n.1 (Tenn. Ct. App. 2005)). "[N]otification of the offense to the offender itself . . . does not rise to the level of 'reporting' of illegal activities." ***Id.*** at *5. For example, in ***Lawson***, 338 S.W.3d at 497, the case involving the construction equipment operator, the Court of Appeals affirmed summary judgment in favor of the employer on the employee's whistleblowing claim because "Plaintiff readily admitted that he never reported the alleged illegal activity to anyone other than Defendant, who was the person engaging in the claimed illegal activity."

The Humane Society cites this Court's decision in ***Williams v. Columbia Housing Authority***, No. M2007-01379-COA-R3-CV, 2008 WL 4426880 (Tenn. Ct. App. W.S. Sept. 30, 2008) as support for its position that Dr. Coleman's complaints to the board of directors were insufficient "reporting." In ***Williams***, the executive director of a public housing authority sued the housing authority after he was fired, claiming that "the Board fired him because he raised issues relating to improper practices of Board members." ***Id.*** at *2. Specifically, he alleged violations by the Board of its personnel policy; violations of its travel expenses policy; the misuse of the housing authority's employees and equipment by certain Board members for personal business; and an improper agreement between the housing authority and the City of Columbia. ***Id.*** We affirmed summary judgment to the employer because, among other things, there was nothing to indicate that the employee "reported this alleged illegal behavior to anyone other than the supposed violators." ***Id.*** at *5. Specifically, he "did not voice any objection to such activity to anyone other than the Board members in question." ***Id.*** The Humane Society claims that ***Williams*** stands for the proposition that "a complaint cannot be considered protected activity, or 'whistle-blowing,' if there was no

report to an outside authority[.]" We disagree. In ***Williams***, the employee's complaint to the board members who were allegedly engaging in improper practices constituted no more than notification of the offense to the offenders themselves. ***Williams*** does not hold that a report must be made to an outside authority, and it does not stand for the proposition that a report to an entity's board of directors can never constitute a sufficient report.

In ***Collins v. AmSouth Bank***, a bank teller had a dispute with her supervisor, the assistant branch manager. 241 S.W.3d at 881. The Court of Appeals affirmed summary judgment in favor of the employer because the teller "failed to present any proof that she reported or attempted to report [the supervisor's conduct] to *other* bank officials or regulators." ***Id.*** at 886 (emphasis added). There was no evidence that the teller attempted to report the incident to the bank's branch manager, to law enforcement officials, or to the bank through its toll-free number for reporting illegal activities. ***Id.*** at 886. The Court explained that employees asserting retaliatory discharge claims "need not report the suspected illegal activities directly to law or regulatory enforcement officials, [but] they must make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities."[18] ***Id.*** at 885.

In ***Emerson v. Oak Ridge Research, Inc.***, 187 S.W.3d 364, 371 (Tenn. Ct. App. 2005), the Court specifically rejected the argument that a complaint about sexual harassment was insufficient where "it was not reported to 'authorities' or some outside entity." The employer in that case claimed that "simply reporting to a supervisor is not sufficient to qualify one as a 'whistleblower'." ***Id.*** We disagreed and found that "reporting a serious infraction of the law to either company management or law enforcement officials would qualify." ***Id.*** (citing *Merryman v. Central Parking System, Inc.*, 1992 WL 330404 (Tenn. Ct. App. Nov. 13, 1992)).

Because Dr. Coleman reported Ms. Freeza's illegal conduct to Dr. Coleman's supervisor and the Humane Society's executive director, Ms. Morgan, and she also reported it to the Humane Society's board of directors, she did more than report the offense to the alleged offender. The Humane Society has not shown that it is entitled to summary judgment on this issue.

---

[18] The Supreme Court later ruled that the ***Collins*** Court erred in imposing a reporting requirement in a refusal to participate case, although the Court said that it "agree[d] with the statement in ***Collins*** concerning the requirements of whistleblowing claims." ***Gossett***, 320 S.W.3d at 788.

### c. Dr. Coleman's Job Duties

The final issue properly raised by the Humane Society with regard to whether Dr. Coleman engaged in protected activity is stated as follows: "Whether one whose job it is to oversee and monitor the conduct complained of can be considered a whistleblower for reporting that conduct."[19] The Humane Society argues:

> Since Dr. Coleman was the person licensed to practice veterinary medicine at the Humane Society, and the controlled substances were obtained under her DEA license, it would have been her own "unprofessional or illegal practices" that would have been in violation of the Act. . . . There is no precedent for allowing a cause of action for retaliation based upon the reporting of one's own illegal behavior.

In support of this argument, the Humane Society claims that "some courts have declined to extend protection to whistleblowers whose job it was to prevent the illegality in question or whose job duties included reporting such violations internally." The Humane Society's brief cited only an unreported case from a New Jersey appellate court, construing that State's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19–1 to –14. We find this argument unavailing. As we recognized in *VanCleave*, 2009 WL 3518211, at *8 n.8:

> A whistleblowing claim could arise from a plaintiff's mandatory duty to report illegal activity, where the plaintiff was motivated only by a desire to perform his mandated duty and thus keep himself out of trouble. See, e.g., *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852 (Tenn. 2002). *Crews* involved a permissive duty to report illegal conduct, but the Court referenced circumstances in which a plaintiff may have a mandatory duty to report illegal conduct. *Id.* at 865 n. 6.

The Humane Society has not presented any compelling reason why an employee should be

---

[19] The Humane Society's brief on appeal also listed, as subissues: "Whether one can be considered a whistleblower when she wasn't the first to report the alleged illegality; . . . [and] Whether one who condones or participates in an allegedly illegal activity can be considered a whistleblower for reporting it." However, its brief does not cite any authority with regard to these issues. Therefore, we will not consider them on appeal. "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

denied the protection of a retaliatory discharge claim, under Tennessee law, for reporting activity that one has a duty to report.[20]  This issue is without merit.

## 2.  Causation

The Humane Society also argues that the trial court should have entered summary judgment in its favor because it demonstrated that Dr. Coleman cannot prove the element of causation under either her common law or statutory retaliatory discharge claims.  We will address each claim separately.

### a.  Common Law

In order to establish a common law claim for retaliatory discharge, the employee must prove "that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy." **Gossett**, 320 S.W.3d at 781.  Accordingly, at trial, Dr. Coleman must show that her protected activity was a substantial factor in the Humane Society's decision to terminate her.  Dr. Coleman's complaints would constitute a substantial factor in the Humane Society's decision if they were "'an important or significant motivating factor for the discharge.'" **Kinsler v. Berkline, LLC**, 320 S.W.3d 796, 800 (Tenn. 2010) (quoting *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993)).

To show that there is no genuine issue of material fact, the Humane Society must either produce or identify evidence that affirmatively negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial.  *See* **Hannan**, 270 S.W.3d at 5.  In its motion for summary judgment, the Humane Society claimed that Dr. Coleman could not prove that her protected

---

[20] We note that the Humane Society's reply brief on appeal cited (for the first time) to several cases from federal courts, construing various federal Acts, which, according to the Humane Society, generally hold that an employee who makes a report in the context of carrying out his job duties has not engaged in "protected activity" within the meaning of those federal Acts. *See, e.g.*, **Pettit v. Steppingstone, Center for the Potentially Gifted**, 429 Fed. Appx. 524, 530, 2011 WL 2646550, at *5 (6th Cir. 2011) (considering what constitutes protected activity under § 215(a)(3) of the Fair Labor Standards Act); **Sasse v. U.S. Dept. of Labor**, 409 F.3d 773 (6th Cir. 2005) (finding that an employee did not engage in protected activity under whistleblower provisions of the federal Clean Air Act, Solid Waste Disposal Act, or the Federal Water Pollution Control Act); **Dunn v. Wal-Mart Stores East, L.P.**, No. 1:11-cv-21756, 2013 WL 1455326, at *6 (S.D. Fla. Apr. 9, 2013) (considering whether a plaintiff engaged in protected activity under Title VII of the federal Civil Rights Act).  We decline the invitation to extend the reasoning of these cases, involving specific *federal* acts, to impose a new requirement on either a common law or a statutory claim of retaliatory discharge under Tennessee law.

conduct was a substantial factor in its decision to terminate her because it submitted evidence that the decision was made because of budgetary restraints. The Humane Society claimed that it simply eliminated the in-house staff veterinarian position in order to reduce costs. It also pointed out that board members began discussing the possibility of terminating Dr. Coleman as early as September 2007 because they felt she was not a "good fit" for the Humane Society. The Humane Society argued,

> In light of board members' feelings about Plaintiffs not being a "good fit" for the Humane Society, the decision to eliminate the staff veterinary position served as a means to maintain the integrity of the tenets of the Humane Society while at the same time reducing costs. For these reasons, Defendants would have made the same employment decision regardless of Plaintiffs asserted internal complaints. Thus, Plaintiffs complaint(s) of illegal activity was not a substantial factor in her termination.

In response to the motion for summary judgment, Dr. Coleman not only maintained that her complaints *were* a substantial factor in her termination, she also disputed the Humane Society's proffered reasons for terminating her, claiming that the Humane Society's stated reasons were pretextual. Dr. Coleman pointed to the deposition testimony of Andrew Israel, who was in charge of fundraising, marketing and special events at the Humane Society during the period of Dr. Coleman's employment. Mr. Israel testified that the Humane Society had a $1 million money market fund that was established for making up operating shortfalls, that funds were withdrawn from the account on a monthly or bi-monthly basis, and that the balance of the account was not depleted because of additional contributions. Mr. Israel testified that there was significant waste occurring at the Humane Society. Mr. Israel further testified that at the time Dr. Coleman was fired, "there was no planned budget" but rather a "working profit and loss statement." He testified:

> To my knowledge, at the point when Dr. Coleman was fired, which I believe was December of '07, we had been running a budget deficit for more than six months. So I do not believe it was a direct reflection on a budget constraint since we had been in a similar situation for many months.

Finally, Mr. Israel testified that he was personally aware of Ms. Morgan's desire to get rid of Dr. Coleman, and the fact that Dr. Coleman's accusations against Ms. Freeza had created hard feelings on the part of Ms. Morgan toward Dr. Coleman.

In further support of her claim that the Humane Society's stated reason was pretextual, Dr. Coleman pointed to the deposition testimony of Humane Society board member Dr. Robert Egerman. On the one hand, Dr. Egerman testified that he and another board member decided that Dr. Coleman was "not a good fit" for the Humane Society in September 2007. (September of 2007 is when Dr. Coleman allegedly discovered that Ms. Freeza was illegally euthanizing animals.) However, Dr. Egerman acknowledged that Dr. Coleman was not terminated at that time. He explained,

> A. . . . going out the next day and firing her wouldn't have been in the best interest of the Humane Society. We were sensitive that there are employment issues here, as well.
>
> Q. Like what?
>
> A. Well, of being named in a lawsuit.

Dr. Egerman explained that December was "the time of year where it's time to be making changes in the personnel costs," and that was the reason why Dr. Coleman was terminated after the December board meeting.

Dr. Coleman pointed out that the Humane Society's profit and loss statement for the first ten months of 2008 (after she was fired in December in 2007) showed that the Humane Society paid outside veterinarians $41,917.77, or an average over that ten-month period of $4,197.78 a month. At $50,000 per year, Dr. Coleman would have received a salary of approximately $4,166 per month. Accordingly, Dr. Coleman claimed that terminating her resulted in "no savings" to the Humane Society.

Finally, Dr. Coleman claimed that the circumstances surrounding her termination were suspicious, as there was supposedly no official vote by the board regarding her termination, she was terminated effective immediately without prior notice, she was required to box up her things and leave the premises immediately, and she was not given a severance benefit like another employee who was recently terminated.

In sum, Dr. Coleman contended that "a reasonable juror could conclude . . . that Dr. Coleman's year-end firing was timed to make the pretext of 'budgetary restraints' seem more plausible," and therefore, summary judgment was inappropriate on the issue of causation.

In response, the Humane Society maintained that there was no genuine issue of material fact as to the reason Dr. Coleman was terminated. It contended that its total vet

expenditures were $10,000 less in 2008 than in 2007. The Humane Society also claimed that the board had already decided that Dr. Coleman was not a "good fit" for the Humane Society in September 2007 *before* she formally complained at the board meeting in October 2007, and therefore, there was no genuine issue of material fact regarding the reason for its decision.

The trial court denied the Humane Society's motion for summary judgment on the element of causation, finding that whether the Humane Society was motivated by retaliation "is a question of pretext, which is a question for the trier of fact and is not appropriate for summary judgment." We agree with the trial court. This Court has previously recognized that "'the standard for summary judgment under the Tennessee Supreme Court's decision in *Gossett v. Tractor Supply Co.* is high indeed.'" *Pierce*, 2013 WL 1190823, at *9 (quoting *Skaan*, 2012 WL 6212891, at *5). "[T]he Tennessee Supreme Court has made it clear that an employer may be motivated by both a legitimate reason and a discriminatory reason, and evidence of a legitimate reason is not sufficient under *Hannan* to negate the employee's claim that the employer also had a discriminatory motive." *Id.* The Court in *Gossett* explained that "evidence of a legitimate reason for discharge does not necessarily show that there is no genuine issue of material fact" as to the existence of a retaliatory motive. 320 S.W.3d at 782. An examination of the facts in *Gossett* is helpful. In that case, the employer submitted deposition testimony from the employee's supervisor, who stated that he discharged the employee in order to reduce the company's workforce. *Id.* The Supreme Court explained that although this evidence might suggest that reducing the company workforce was "one reason" for discharging the employee, it failed to show that reducing the workforce was "the exclusive reason," as the evidence did not disprove the employee's allegations or otherwise show "an absence of a retaliatory motive." *Id.* at 783. Even if the supervisor's testimony was taken as true,[21] there would still be a question of fact as to whether the retaliatory motive alleged by the employee amounted to a substantial factor in the decision to terminate him. *Id.* In sum, the Court said that its holding "does not exclude the possibility of summary judgment when an employer presents *undisputed* evidence that a legitimate reason was the *exclusive* motivation for discharging the employee." *Id.* at 786 (emphasis in *Gossett*). However, the Court noted that, generally, "'[t]he question of whether the employer's judgment was reasonable or was instead motivated by improper considerations is for the *jury* to consider.'" *Id.* at 787 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 n.6 (6th Cir. 2008)). "'Inquiries regarding what actually motivated an employer's decision are very fact intensive.'" *Kinsler*, 320 S.W.3d at 801 (quoting *Wright v. Murray Guard, Inc.*,

---

[21] Of course, under *Hannan*, "a court considering a summary judgment motion 'must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence.'" *Gossett*, 320 S.W.3d at 784.

455 F.3d 702, 721 (6th Cir. 2006) (Moore, J., concurring)).

Returning now to the present case, we find that there are genuine issues of material fact as to whether the Humane Society terminated Dr. Coleman for the reasons the Humane Society claimed, or because of Dr. Coleman's protected activity. Taking the strongest legitimate view of the evidence in favor of Dr. Coleman, allowing all reasonable inferences in her favor, and discarding all countervailing evidence, the record shows that Dr. Coleman began complaining to Ms. Morgan about Ms. Freeza's illegal performance of euthanasia and related practices sometime after she discovered it in September 2007, and she formally addressed the board of directors about the issues in October 2007. Some members of the board decided that Dr. Coleman was not a "good fit" for the Humane Society in September 2007, which appears to be right around the time that Ms. Freeza's illegal performance of euthanasia became an issue, following the incident involving the eleven cats on September 20.[22] Despite this sentiment, Dr. Coleman was not terminated until December of 2007. Dr. Egerman's testimony makes it clear that the board members were aware of the possibility of "being named in a lawsuit" as it related to the timing of Dr. Coleman's termination. The deposition testimony of Mr. Israel and the profit and loss statement submitted by Dr. Coleman cast further doubt on whether the Humane Society's claimed budget restraints were actually the motivation for the board's decision. Moreover, Dr. Coleman testified that Ms. Morgan had assured her during July or August of 2007 that her job was "budgeted in" for future years and was secure. Based on these facts, a reasonable person could conclude that Dr. Coleman's complaints and refusal to participate in illegal activity were a substantial factor in the Humane Society's decision to discharge her. This creates a genuine issue of material fact, which precludes summary judgment on the element of causation.[23] We affirm the trial court's decision in this regard.

### b. The TPPA claim

An employee asserting retaliatory discharge under the TPPA must prove that he or she was terminated "solely" for his or her refusal to participate in or remain silent about the illegal activity. *Sykes*, 343 S.W.3d at 27. In other words, "under the [Whistleblower Act],

---

[22] "[C]lose temporal proximity between a protected activity and an adverse employment action is a fact that an employee may offer to demonstrate that a genuine issue of material fact exists as to the causation element." *Sykes*, 343 S.W.3d at 31.

[23] Because this genuine issue of material fact is easily ascertainable and dispositive of the motion for summary judgment, conducting the burden-shifting analysis described in *Hannan* is unnecessary to the disposition of this case. *See Kinsler*, 320 S.W.3d at 801.

the plaintiff must demonstrate an exclusive causal relationship between his whistleblowing activity and his subsequent discharge." *Guy*, 79 S.W.3d at 535. "By requiring a plaintiff employee to show that he or she was 'discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities,' the legislature has chosen to enact a stringent standard and set the bar high for recovery under a retaliatory discharge claim pursuant to the Whistleblower Act." *Sykes*, 343 S.W.3d at 28. The Humane Society again argues that because of its proffered reason for terminating Dr. Coleman, i.e., the budget, Dr. Coleman cannot prove the element of sole causation.

In *Sykes*, our Supreme Court affirmed summary judgment in favor of an employer on the issue of sole causation, where the employer produced *undisputed* evidence showing valid and legitimate reasons for terminating the plaintiff-employees, and in response, the employees failed to demonstrate a genuine issue of material fact regarding whether the decision to terminate their employment was solely due to their protected activity. 343 S.W.3d at 27. For example, one of the employees had repeated and egregious violations of company policy that had resulted in clear and unambiguous reprimands and warnings. *Id.* at 28. As a result, the Court concluded that, "even viewing all the proof in the light most favorable to [the employees], a reasonable juror could not conclude that the sole reason for the termination of [their] employment was their refusal to participate in or remain silent about the alleged illegal activities." *Id.*

In the case at bar, however, the Humane Society's proffered reason for terminating Dr. Coleman was hotly disputed. Dr. Coleman presented the testimony of Mr. Israel and the Humane Society's profit and loss statement in order to cast doubt on the legitimacy of the Humane Society's stated reason regarding the budget. She also testified that she had previously been assured that her job was "budgeted in" and secure. Furthermore, there is the testimony from Dr. Egerman, and other documentary evidence, which suggests that the board of directors had already decided to terminate Dr. Coleman prior to any decision about the next year's budget. An October 1 email from one of the board members stated, "I believe we've already decided Dr. Coleman is gone[.]"

Even though the element of sole causation is a challenging element for a plaintiff under the TPPA, we find that Dr. Coleman has produced evidence to show that a genuine issue of material fact exists with regard to this element of her claim. Viewing all the proof in the light most favorable to Dr. Coleman, we believe that a reasonable juror could conclude that the Humane Society's stated reason for terminating Dr. Coleman was pretextual, and the sole reason for her termination was her refusal to participate in or remain silent about the alleged illegal activities.

We note that the Humane Society also argued that it had negated the element of sole causation by pointing to Dr. Coleman's own deposition testimony, where she was asked, "So isn't it possible then that budget restraints led to the termination of you as a staff vet and there were no other staff vets hired after you; isn't that possible?" and Dr. Coleman responded, "I suppose it's possible." We rejected an identical argument in ***Wisdom v. Wellmont Health System***, No. E2010-00716-COA-R9-CV, 2010 WL 5093867, at *5 (Tenn. Ct. App. 2010) *perm. app. denied* (Tenn. Apr. 14, 2011), where an employer argued that an employee could not prove sole causation at trial when she testified during her deposition that she believed that her refusal to remain silent was not the sole cause of her discharge. The Court rejected this theory with the following explanation:

> [P]laintiff has stated sufficient facts to show that a genuine issue exists with regard to the motivation for her discharge by defendant, which is all that she must do at this stage. Whether plaintiff's subjective belief that other factors may have also influenced the decision is ultimately borne out by the factual evidence is an issue which must be determined by the trier of fact.

Likewise, in the case before us, we find that a genuine issue of material fact exists as to the motivation for Dr. Coleman's discharge, and summary judgment was not appropriate on this element. The trial court's decision in that regard is affirmed.

### 3. Front Pay

Finally, the Humane Society argues on appeal that the trial court should have granted its motion for summary judgment on the issue of front pay, because, it claims, "the evidence relating to potential economic damages is undisputed." The Humane Society acknowledges that Dr. Coleman made less money in 2008 than she did working for the Humane Society in 2007, but it points out that she made more money from 2009 forward, at least according to her tax returns.

The Humane Society's motion for leave to seek an interlocutory appeal did not include any discussion of the issue of "front pay." Likewise, the trial court's order granting the Humane Society leave to seek an interlocutory appeal listed several specific questions regarding retaliatory discharge claims, which it found were appropriate for submission to the Court of Appeals, but the order never mentioned the issue of front pay. "Under Rule 9 of the Tennessee Rules of Appellate Procedure, the issues in a Rule 9 interlocutory appeal are limited to the questions that are certified by the trial court in its order granting permission for

the appeal and also certified by the appellate court in its order granting permission for the appeal." ***Shaffer v. Memphis Airport Authority, Service Management Systems, Inc.***, No. W2012-00237-COA-R9-CV, 2013 WL 209309, at *3 (Tenn. Ct. App. Jan. 18, 2013) (citing *In re Bridgestone/Firestone*, 286 S.W.3d 898, 902 (Tenn. Ct. App. 2008)); *see also* ***Heatherly v. Merrimack Mut. Fire Ins. Co.***, 43 S.W.3d 911, 914 (Tenn. Ct. App. 2000). For these reasons, we decline to consider on appeal whether the trial court erred in denying the motion for summary judgment on the issue of front pay.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby reversed in part and affirmed in part, and the case is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellee, the Humane Society of Memphis and Shelby County, and its surety,[24] for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.

---

[24] Both parties filed Rule 9 applications in this case, and both parties filed appeal bonds for costs, listing their attorneys as sureties. As a result, the Humane Society has a surety for the costs of the appeal, even though it was designated as the appellee.